UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 13-65677-JRS |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | CHAPTER: 7 |
|     Debtor | ) | |
| | ) | |
| ASSOCIATED CREDIT UNION, | ) | |
|     Movant | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | |
|     Respondent | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEIL C. GORDON, | ) | |
|     Trustee | ) | |

## MOTION TO LIFT AUTOMATIC STAY

**NOW COMES**, ASSOCIATED CREDIT UNION (hereinafter referred to as "ACU"), a creditor and party in interest in the above-captioned matter and Movant in this proceeding and respectfully shows this Court as follows:

1.

The Debtor, Zakaryah Ben-Yisrael, also known as Ronald Lee Johnson, filed a petition for relief under Chapter 7 of the United States Bankruptcy Code on July 19, 2013.

2.

The Bankruptcy Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §157 and 11 U.S.C. §362.

3.

ACU is a securd creditor of the Debtor and holds valid, perfected first and second security interests in the Debtor's real property located at 1304 Brookview Lane, Smyrna, Georgia 30080 ("Property") by virtue of a Note, Security Deed, copies of which are attached hereto as Exhibit A. The balance owed to ACU is $35,185.51.

4.

The Debtor desires to surrender the Property to ACU.   The automatic stay should be terminated for cause.

5.

The Property is not necessary for the reorganization of the Debtor and is burdensome to the estate and of inconsequential value and the 14-day requirement pursuant to F.R.B.P. 4001(a)(3) should be waived.

**WHEREFORE,** ACU prays the automatic stay, pursuant to 11 U.S.C. §362 be lifted to permit ACU to proceed against the Property and this Court grant such other and further relief as it deems just and proper.

RESPECTFULLY SUBMITTED this 22d day of August 2013.

*/s/ Albert F. Nasuti*
**ALBERT F. NASUTI**
Georgia State Bar No. 535209

For the Firm of
THOMPSON, O'BRIEN, KEMP & NASUTI, P.C.
40 Technology Parkway South, Suite 300
Norcross, Georgia 30092
 (770) 925-0111
E-mail:  anasuti@tokn.com
Attorneys for Associated Credit Union

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 13-65677-JRS |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | CHAPTER: 7 |
| Debtor | ) | |
| | ) | |
| ASSOCIATED CREDIT UNION, | ) | |
| Movant | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | |
| Respondent | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEIL C. GORDON, | ) | |
| Trustee | ) | |

CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing Motion to Lift Automatic Stay upon the Debtor, Zakaryah Ben-Yisrael, 1259 Jordan Road, Powder Springs, Georgia 30127; Debtor's Attorney, Shelley A. Elder, Elder Law Firm, PLLC, 1558 Ridenour Parkway, NW, Kennesaw, Georgia 30152; and the Chapter 7 Trustee, Neil Gordon, Arnall, Golden & Gregory, LLP, 171 17th Street NW, Suite 2100, Atlanta, Georgia 30363, with a copy of same in an envelope with adequate postage affixed thereon to insure delivery by United States Mail. This 22d day of August, 2013.

*/s/ Albert F. Nasuti*
**ALBERT F. NASUTI**
Georgia State Bar No. 535209

For the Firm of
THOMPSON, O'BRIEN, KEMP & NASUTI, P.C.
40 Technology Parkway South, Suite 300
Norcross, Georgia 30092
 (770) 925-0111
E-mail:  anasuti@tokn.com
Attorneys for Associated Credit Union

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CASE NO.: 13-65677-JRS |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | |
| | ) | CHAPTER 7 |
| Debtor | ) | |
| | ) | |
| ASSOCIATED CREDIT UNION, | ) | HONORABLE JAMES R. SACCA |
| Movant | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ZAKARYAH BEN-YISRAEL, | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NEIL C. GORDON, | ) | |
| Trustee | ) | |

## CONSENT ORDER LIFTING AUTOMATIC STAY

**IT APPEARING** that ASSOCIATED CREDIT UNION (hereinafter referred to as "ACU")

is a secured creditor of the Debtor and holds valid, perfected first and second security interests in the

Debtor's real property located at 1304 Brookview Lane, Smyrna, Georgia 30080(the "Property"); and

**IT APPEARING** that the Debtor, Zakaryah Ben-Yisrail, also known as Ronald Lee Johnson, desires to surrender the Property to ACU; and

**IT APPEARING** that the Property is not necessary for the effective reorganization of the Debtor and is burdensome to the estate and of inconsequential value; it is

**ORDERED** that the automatic stay pursuant to 11 U.S.C. §362 is hereby lifted to the extent provided in 11 U.S.C. § 362(d) as to the Property and the 14-day requirement pursuant to F.R.B.P. 4001(a)(3) is waived; and it is further

**ORDERED** that in the event any equity is realized from the disposition of the Property, said equity shall be paid by ACU to the Chapter 7 Trustee.

**END OF DOCUMENT**

**PREPARED AND SUBMITTED BY:**

/s/ Albert F. Nasuti
ALBERT F. NASUTI
Georgia State Bar No. 535209
THOMPSON, O'BRIEN, KEMP & NASUTI, P.C.
40 Technology Parkway South, Suite 300
Norcross, Georgia 30092
(770) 925-0111
E-mail:  anasuti@tokn.com
Attorneys for Associated Credit Union

**CONSENTED TO:**                                    **NO OPPOSITION:**

 /s/ Shelley A. Elder
SHELLEY A. ELDER                           NEIL C. GORDON
Georgia State Bar No. 130522               Georgia State Bar Nor 402587
1558 Ridenour Parkway, NW,                 Suite 2100 171 17th Street, NW
Kennesaw, Georgia 30152                     Atlanta, Georgia 30363
Attorney for Debtor                         Chapter 7 Trustee
selderlaw@aol.com                           neil.gordon@agg.com
(404) 783-2244                              (404) 873-8596
 *with express permission by
 Albert F. Nasuti

## DISTRIBUTION LIST

DEBTOR:                     Zakaryah Ben-Yisrael
                           1259 Jordan Road
                           Powder Springs, Georgia 30127

DEBTOR'S ATTORNEY:         Shelley A. Elder
                           1558 Ridenour Parkway, NW
                           Kennesaw, Georgia 30152

CHAPTER 7 TRUSTEE:         Neil C. Gordon
                           Suite 2100
                           171 17rg Street, NW
                           Atlanta, Georgia 30363

MOVANT'S ATTORNEY:         Albert F. Nasuti
                           Thompson, O'Brien, Kemp & Nasuti, P.C.
                           40 Technology Parkway South, Suite 300
                           Norcross, Georgia 30092

Deed Book 13358 Pg 4606
Filed and Recorded May-01-2001 04:36pm
2001-0069696
Georgia Intangible Tax Paid $0.00

Jay C. Stephenson
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.



**EXHIBIT**

tabbies

*A*

Return Recorded Document to:
Cohen/ David & Associates, P.C.
Attorneys at Law 1172 Grimes Bridge Road
Suite 400
Roswell, GA 30075

File #: 01-1113

------------------------ [Space Above This Line For Recording Data] ------------------------

# SECURITY DEED

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21.
Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated **April 23, 2001,** together with all Riders to this document.
(B) **"Borrower"** is **RONALD L. JOHNSON** . Borrower is the grantor under this Security Instrument.
(C) **"Lender"** is **Associated Credit Union.** Lender is a Corporation organized and existing under the laws of State of Georgia.
Lender's address is **6801 Peachtree Industrial Blvd, Atlanta, GA 30360.** Lender is the grantee under this Security
Instrument.
(D) **"Note"** means the promissory note signed by Borrower and dated **April 23, 2001.** The Note states that Borrower owes
Lender **Sixty-Six Thousand and 00/100 (U.S.$66,000.00)** plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than **May 1, 2016.**
(E) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
(F) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and
all sums due under this Security Instrument, plus interest.
(G) **"Riders"** means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by
Borrower [check box as applicable]:

[ ]Adjustable Rate Rider      [ ]Condominium Rider      [ ]Second Home Rider

[ ]Balloon Rider      [ ]Planned Unit Development Rider

[ ]1-4 Family Rider      [ ]Biweekly Payment Rider

[XX ] Other(s) [Specify] Waiver of Borrower's Rights and Closing Attorney's Affidavit

**GEORGIA-**Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 1 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4607

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I) "Community Association Dues, Fees and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the **County of COBB   , State of Georgia**
**[Type of Recording Jurisdiction] [Name of Recording Jurisdiction]**

   **All that tract or parcel of land lying and being in Land Lots 777 and 808 of the 16th District, 2nd Section, Cobb County, Georgia, being Lot 70, Block A, of Falling Water Subdivision, Unit Four, as per plat recorded in Plat Book 81, page 43, Cobb County, Georgia Records, which plat is incorporated herein and made a part of this description by reference.**

**which currently has the address of:**

**1304 Brookview Lane**
**[Street]**

**Smyrna,   Georgia   30080 ("Property Address"):**
**[City]        [Zip Code]**

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 2 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4608

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and nonuniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.  Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 3 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4609

Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 4 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4610

affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 5 of 11) **Form 3011 1/01**

persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(A) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will**

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 6 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4612

owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(B) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 7 of 11) **Form 3011 1/01**

but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 8 of 11) **Form 3011 1/01**

Deed Book 13358 Pg 4614

Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 9 of 11)    Form 3011 1/01

which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.  Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale. Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.**

**Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.**

**If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 10 of 11) **Form 3011 1/01**

ed Book 13358 Pg 4616

**24. Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

**25. Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

**26. Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, Sealed and delivered in the presence of:

_____(Seal)
RONALD L. JOHNSON  Borrower

Social Security Number _____

_____
Unofficial Witness

_____(Seal)
Borrower

Social Security Number _____

_____
NOTARY PUBLIC, _____County

_____(Seal)
Borrower

Social Security Number _____

_____(Seal)
Borrower

Social Security Number _____

_____[Space Below This Line For Acknowledgement]_____

**GEORGIA**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (Page 11 of 11) **Form 3011 1/01**

# NOTE

April 23rd, 2001

Roswell, GA

**1304 Brookview Lane, Smyrna, Georgia 30080**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$66,000.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **Associated Credit Union**. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **6.5%.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **June 1st, 2001.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on **May 1st, 2016,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **6801 Peachtree Industrial Blvd, Atlanta, GA  30360** or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$ 574.94.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If a Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT **Form 3200 1/01** (page 1 of 2)

Deed Book 13494 Pg 6071
Filed and Recorded Feb-15-2002 08:29am
2002-0035514
Georgia Intangible Tax Paid $0.00

*Jay C. Stephenson*
Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

AFTER RECORDING, RETURN TO:
John H. David, Jr., ESQ.
COHEN/DAVID & ASSOCIATES, P.C.
1172 Grimes Bridge Road Suite 400
Roswell, GA 30075
ACU/Johnson/02-1042
Loan #232273

*232273*

## HOME EQUITY
## DEED TO SECURE DEBT

THIS DEED is made this 7th day of February, 2002, between Grantor(s), RONALD L. JOHNSON (Borrower"), and, Grantee, ASSOCIATED CREDIT UNION, a credit union organized and existing under the laws of Georgia, whose address is 6251 Crooked Creek Road, Norcross, Georgia 30092 (herein "Lender").

Whereas, Borrower is justly indebted to Lender for advances extended to Borrower by Lender in an amount up to $18,000.00 outstanding at any time pursuant to the terms and conditions of an open-end line of credit entitled ASSOCIATED CREDIT UNION'S HOME EQUITY ACCESS AGREEMENT AND TRUTH-IN-LENDING DISCLOSURES (herein "Note") bearing even date herewith, made between Borrower and Lender, and by reference made a part hereof. The Note, unless renewed as provided therein, will mature in ten (10) years from the date of the Note.

To Secure to lender the repayment of the indebtedness evidenced by the Note, with interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed to Secure Debt, and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby grant and convey to Lender and Lender's successors and assigns, with power of sale, the following described property located in the County of COBB, State of Georgia:

All that tract or parcel of land lying and being in Land Lot 777 of the 17th District, 2nd Section, Cobb County, Georgia being Lot 70, Block A, of Falling Water Subdivision, Unit Four, as per plat recorded in Plat Book 80, page 36, Cobb County, Georgia Records, which plat is incorporated herein by reference.

Which has the address of 1304 Brookview Lane, Smyrna, Georgia 30080.

Lender and Lender's successors and assigns forever, together with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, rents, royalties, mineral, oil and gas rights and profits, water, water rights, and water stock, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this Deed; and all of the foregoing, together with said property (or the leasehold estate if this Deed is on a leasehold) are herein referred to as the "Property".

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property, that the Property is unencumbered, except for encumbrances of record, and that Borrower will warrant and defend generally the title to the Property against all claims and demands, subject to the encumbrances of record.

Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, and any late charges as provided in the Note.

2.    **Prior Deeds to Secure Debt; Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any security deed, mortgage, deed of trust or other security agreement with a lien which has priority over this Deed, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed, and leasehold payments or ground rents, if any.

3.    **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All premiums on insurance policies shall be paid by Borrower making payment, when due, directly to the insurance carrier.

All insurance policies and renewals thereof shall be in form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. In the event that there is any security deed, mortgage, deed of trust or other security agreement with a lien which has priority over this Deed, and the terms of same require the holder thereof to receive the originals of said policies and renewal notices, then Borrower may satisfy this paragraph by providing Lender with copies of same. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, provided such restoration or repair is economically feasible and the security of this Deed is not thereby impaired. If such restoration or repair is not economically feasible or if the security of this Deed would be impaired, the insurance proceeds shall be applied to the sums secured by this Deed, with the excess, if any, paid to Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to

FECU-5357                                                                                                                            REV. 3/90

Deed Book 13494 Pg 6072

restoration or repair of the Property or to the sums secured by this Deed.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in paragraph 1 hereof or change the amount of such installments. If under paragraph 15 hereof the Property is acquired by Lender, all right, title and interest of Borrower in and to any insurance policies and in and to the proceeds thereof resulting from damage to the Property prior to the sale or acquisition shall pass to Lender to the extent of the sums secured by this Deed immediately prior to such sale or acquisition.

**4. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property. If this Deed is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents. If a condominium or planned unit development rider is executed by Borrower and recorded together with this Deed, the covenants and agreements of such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Deed as if the rider were a part hereof. Any default thereunder shall at option of Grantee hereunder be deemed a default hereunder.

**5. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs.

Any amounts disbursed by Lender pursuant to this paragraph 5, with interest thereon, shall become additional indebtedness of Borrower secured by this Deed. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable from time to time on outstanding principal under the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law. Nothing contained in this paragraph 5 shall require Lender to incur any expense or take any action hereunder.

**6. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Deed, with the excess, if any, paid to Borrower. In the event of a partial taking of the Property, unless Borrower and lender otherwise agree in writing, there shall be applied to the sums secured by this Deed such proportion of the proceeds as is equal to that proportion which the amount of the sums secured by this Deed immediately prior to the date of taking bears to the fair market value of the Property immediately prior to the date of taking with the balance of the proceeds paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date such notice is mailed, Lender is authorized to collect and apply the proceeds, at Lender's option, either to restoration or repair of the Property or to the sums secured by this Deed.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of the monthly installments referred to in paragraph 1 hereof or change the amount of such installments.

**8. Borrower Not Released.** Extension of the time for payment or modification of amortization of the sums secured by this Deed granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed by reason of any demand made by the original Borrower and Borrower's successors in interest.

**9. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy. The procurement of insurance or the payment of taxes or other liens or charges by Lender shall not be a waiver of Lender's right to accelerate the maturity of the indebtedness secured by this Deed.

**10. Remedies Cumulative.** All remedies provided in this Deed are distinct and cumulative to any other right or remedy under this Deed or afforded by law or equity, and may be exercised concurrently, independently or successively.

**11. Successors and Assigns Bound; Joint and Several Liability; Captions.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower. All covenants and agreements of Borrower shall be joint and several. The captions and headings of the paragraphs of this Deed are for convenience only and are not to be used to interpret or define the provisions hereof.

**12. Governing Law; Severability.** This Deed shall be governed by the law of Georgia. In the event that any provision or clause of this Deed or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Deed or the Note which can be given effect without the conflicting provisions, and to this end the provisions of the Deed and the Note are declared to be severable.

**13. Borrower's Copy.** Borrower shall be furnished a copy of the Note and of this Deed at the time of execution or after recordation hereof.

**14. Transfer of the Property.** If all or any part of the Property or an interest therein is sold or transferred by Borrower without Lender's prior written consent, excluding (a) the creation of a lien or encumbrance subordinate to this Deed, (b) a transfer by devise, descent or by operation of law upon the death of a joint tenant or (c) the grant of any leasehold interest of three years or less not containing an option to purchase, Lender may, at Lender's option, declare all the sums secured by this Deed to be immediately due and payable.

**15. Acceleration; Remedies.** Upon Borrower's breach of any covenant or agreement of Borrower in this Deed and/or if Borrower becomes in default under the terms and conditions of the Note, Lender may declare the entire indebtedness secured hereby immediately due, payable and collectible, without notice to Borrower, regardless of maturity, and, in that event, the entire indebtedness secured hereby shall become immediately due, payable and collectible; and thereupon, Lender may sell and dispose of the Property at public auction at the usual place for conducting sales at the courthouse in the county where the Property or any part thereof may be, to the highest bidder for cash, first advertising the time, terms and place of such sale by publishing a notice thereof once a week for four consecutive weeks (irrespective of the number of days) in a newspaper in which sheriff's advertisements are published in said county, all other notice except that required by law being hereby waived by Borrower, and Lender may thereupon execute and deliver to the purchaser at said sale a sufficient conveyance of the Property in fee simple, which conveyance may contain recitals as to the happening of the default upon which the execution of the power of sale herein granted, depends, and said recitals shall be presumptive evidence that all

FECU-6357                                                                                                                                REV. 2/90

Deed Book 13494 Pg 6073

preliminary acts prerequisite to said sale and deed were in all things duly complied with: and Lender, its agents, representatives, successors or assigns, may bid and purchase at such sale; and Borrower hereby constitutes and appoints Lender or its assigns agent and attorney in fact to make such recitals, sale and conveyance, and all of the acts of such attorney in fact are hereby ratified, and Borrower agrees that such recitals shall be binding and conclusive upon Borrower and that the conveyance to be made by Lender, or its assigns, (and in the event of a deed in lieu of foreclosure, then as to such conveyance) shall be effectual to bar all right, title and interest, equity of redemption, including all statutory redemption, homestead, dower, courtesy and all other exceptions of Borrower, or its successors in interest, in and to said Property; and Lender, or its assigns, shall collect the proceeds of such sale, reserving therefrom all unpaid indebtedness secured hereby with interest then due thereon, together with all costs and charges for advertising, and commissions for selling the Property, and 15% of the aggregate amount due, as attorney's fees, and pay over any surplus to Borrower (in the event of deficiency Borrower shall immediately on demand from Lender pay over to Lender, or its nominee, such deficiency); and Borrower agrees that possession of the Property during the existence of the indebtedness secured hereby by Borrower, or any person claiming under Borrower, shall be that of tenant under Lender, or its assigns and, in case of a sale, as herein provided, Borrower or any person in possession under Borrower shall then become and be tenants holding over, and shall forthwith deliver possession to the purchaser at such sale or be summarily dispossessed in accordance with the provisions of law applicable to tenants holding over, the power and agency hereby granted are coupled with an interest and are irrevocable by death or otherwise, and are in addition to any and all other remedies which lender may have at law or in equity.

Lender, in any action to foreclose this deed, or upon any event of default, shall be at liberty to apply for the appointment of a receiver of the rents and profits or of the Property or both without notice, and shall be entitled to the appointment of such a receiver as a matter of right, without consideration of the values of the Property as security for the amounts due lender, or the solvency of any person or corporation liable for the payment of such amounts.

In case of any sale under this deed by virtue of the exercise of the power herein granted, or pursuant to any order in any judicial proceedings or otherwise, the Property or any part thereof may be sold in one parcel in its entirety, or in such parcels, manner or order as Lender in its sole discretion may elect, and one or more exercises of the powers herein granted shall not extinguish or exhaust the power unless the entire Property is sold or the indebtedness secured hereby is paid in full.

**16. Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 15 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property, including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, and then to the sums secured by this Deed. Lender and the receiver shall be liable to account only for those rents actually received.

**17. Release.** Upon payment of all sums secured by this Deed, Lender shall cancel this Deed. Borrower shall pay all costs or recordation, if any.

**18. Waiver of Homestead.** Borrower hereby waives all right of homestead exemption in the Property.

**19. Waiver of Security Interest.** Notwithstanding any language herein contained to the contrary, this instrument shall not include a security interest in any "consumer goods" as defined in official Code of Georgia Annotated Sec. 11-9-109(1) which are not in fact at present or do not in fact hereafter become affixed to and a part of the realty herein conveyed and which in fact at present are not or do not hereafter become a "fixture" as defined in Official Code of Georgia Annotated Sec. 11-9-313(1)(a).

**20. Deed to Secure Debt.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

**21. Renewals, Extensions and Modifications (including Additional Indebtedness).** This Deed to Secure Debt and the property shall also secure any renewals, extensions or modifications of the indebtedness evidenced by the Note, including additional indebtedness (above the credit limit designated hereinabove), that may be or become owing by Borrower or Lender under the Note, as subsequently modified. Any default or other failure to comply fully with any provision of the Prior Security Deed shall constitute an event of default under this Security Deed. Grantee shall determine, in Grantee's judgement, whether any default or other failure to comply with any provision of the Prior Security Deed exists at any time. In the event Grantee determines that a default or other failure to comply with any provision of the prior Security Deed exists, Grantee may, at Grantee's election at any time thereafter, take any such action, advance or pay any money or perform any act which Grantee considers necessary or appropriate to relieve or to cure any such default or failures, and all money so advanced or paid and all expenses incurred by Grantee in connection with any such action or performance shall become part of the indebtedness, shall be secured by this Security Deed, shall be payable by Grantor to Grantee upon demand by Grantee and shall bear interest from the date advanced, paid or incurred at the highest rate per annum then being charged with respect to any part of the Indebtedness. Grantor shall not hereafter borrow, incur or permit to incurred in any manner, any indebtedness which would be secured by the Prior Security Deed, other than interest which accrues prior to default on the outstanding principal balance secured thereby on the date hereof. Grantor hereby transfers and assigns to Grantee any and all proceeds, in excess of the amount required to satisfy the indebtedness secured by the Prior Security Deed, which may be or become payable by reason of foreclosures under the Prior Security Deed. Grantor further authorizes, directs and instruct that any all such proceeds be paid directly to Grantee and not to Grantor, up to the full extend required to satisfy the indebtedness, and Grantor hereby releases and relinquished any all right, title interest and claims in and to such proceeds to that extent. The term "foreclosure" as used above shall mean and include, without limitation, foreclosure of all or any part of the Premises by exercise of any power of sale contained in the Prior Security Deed, judicial foreclosures, conveyance in lieu of foreclosures or other means. Any and all renewal or renewals, extension or extensions, modification or modifications thereof, and substitution or substations therefor, either in whole or in part; and all indebtedness now or hereafter owing by Grantor to Grantee, however or whenever created, incurred, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, or due or to become due, and any and all renewal or renewals, extension or extensions, modification or modifications of and substitution or substitutions for, said indebtedness, either in whole or in part. The obligations which this deed and security agreement is given to secure are hereinafter sometimes referred to collectively as the "Indebtedness." At Grantees option, Grantor's default of the following recitals, shall be deemed a default hereunder; (1) Grantor shall provide Grantee with a letter from Grantor's said first mortgage lender that (1) this security deed is not in violation thereunder (2) they shall not accelerate their said loan or exercise any of their remedies in the event of default without giving Grantor herein the same notice they give to Grantee or 30 days notice, which ever is greater; and (3) shall give Grantee herein, the right to cure any and all defects of said first mortgage; (2) Grantor shall open and maintain, so long as the indebtedness secured hereunder is unpaid, an account at a financial institution agreeable to Grantee herein, from which all payments due on Grantor's said prior first mortgage, shall be automatically debited and notice thereof timely sent each and month to Grantee herein.

**22. Waiver of Borrower's Rights.** (1) Has, this date, borrowed the above-stated amount of money from the named Lender; (2) Has signed and delivered to said Lender a document entitled "Security Deed" or "Deed to Secure Debt", which transferred the above-described property to the Lender for the purpose of securing the prompt repayment of the said loan; (3) Understands that in the event the undersigned fails to make payments on said loan as and when due, or to comply with the terms thereof, the Lender is authorized to sell the property; (4) Understands that in the event the undersigned fails to make payments on said loan that the undersigned has given up; (a) the

FECU 6357                                                                                                    REV. 2/90

Deed Book 13494 Pg 6074

right to be notified by the Lender, of the sale of the property, except as provided in the Security Deed or Deed to Secure Debt; (b) the right to a hearing before a judge to explain the reason for failure to make payments on the loan, or other default prior to Lender's acceleration of said Note and/or the Security Deed or Deed to Secure Debt, unless the undersigned brings such an action; (c) the right to redeem the property after it has been sold; and (d) the Homestead Exemption (not for real estate tax purposes) granted under the laws of the State of Georgia and of the United States of America; (5) Understands that should the undersigned default in making payments, and as a consequence thereof, the Lender sells the property, that the undersigned could be personally responsible for any difference between the sales price and the total of the unpaid principal balance, accrued interest and the costs of the sale, including legal fees; (6) Has been advised that this is a legally binding transaction and has the right to consult an attorney at law of his own choosing prior to signing any documents; (7) Has read this statement and hereby affirms and assents to all of the matters herein set forth; (8) VOLUNTARILY, KNOWINGLY AND INTELLIGENTLY executed and delivered said Security Deed or Deed to Secure Debt and waiver of notice and judicial hearing prior to sale.

THE BORROWER ACKNOWLEDGES THE RECEIPT ON THIS DATE OF A COMPLETELY FILLED-IN COPY OF THIS INSTRUMENT PRIOR TO THE EXECUTION THEREOF.

IN WITNESS WHEREOF, Borrower has executed and sealed this Deed.

_____ (SEAL)
Ronald L. Johnson

_____ (SEAL)

Signed, sealed and delivered
in the presence of:

(1) _____
Unofficial Witness

(2) _____
Notary Public

FECU-6357                                                                    REV. 3/90

**ASSOCIATED CREDIT UNION**

6251 Crooked Creek Road
Norcross, Georgia 30092-3107 * (770) 448-8200

**ASSOCIATED CREDIT UNION'S
HOME EQUITY ACCESS AGREEMENT
TRUTH-LENDING DISCLOSURES**

Member's Name: Ronald L. Johnson

The undersigned jointly and severally agree with Associated Credit Union ("Credit Union") to the terms below.

Account Number:

| Section A<br>Credit Limit | Section B<br>Daily Periodic Rate | Section C<br>ANNUAL PERCENTAGE RATE * |
|---|---|---|
| $18,000.00 | .016666% | 6.00 |

GA Loan Fee $6.50   Flood Cert $18.00

Section D
Appraisal $0.00   Title Exam $90.00       Filing Fees$0.00        Credit Report $0.00

Section E                    1304 Brookview Lane, Smyrna, Georgia 30080

**STATEMENT OF AGREEMENT
SECTION F**

1. **DEFINITIONS:** The following definitions shall apply to the Agreement:
   (a) **account** means the account with the Credit Union established for you by this Agreement;
   (b) **billing cycle** means the time interval between the closing dates of your account;
   (c) **closing date** means the last day of a billing cycle, after which date transactions posted to your account will be reflected on the next periodic statement;
   (d) **Deed to Secure Debt** means the Deed to Secure Debt, executed of even date herewith, wherein the real property described in Section E is pledged to secure the repayment of your account;
   (e) **draw period** means the period of time during which you may obtain a loan advance. The initial draw period is for a period of five (5) years from the date your account is opened. The Credit Union may renew the initial draw period for consecutive period of one (1) year each as provided herein;
   (f) **financial institution** means a credit union, bank, trust company, savings and loan association or check selling organization;
   (g) **loan advance** means your obtaining cash (or monies being paid by the Credit Union to a third party on your behalf) by submitting a request voucher drawn against the account;
   (h) **payment balance** shall mean the principal balance of your account immediately after a loan advance and shall remain so until and unless your minimum payment factor changes (from 1.5% to 2.0% or vice versa), then, in which event your payment balance shall be the principal balance of your account immediately following such minimum payment factor change and shall remain so until and unless there is a subsequent loan advance or minimum payment factor change;
   (i) **periodic statement** means the statement of your account that the Credit Union mails to you at the completion of your account's billing cycle;
   (j) **repayment period** means the period after the draw period expires and during which you may not obtain further loan advances. The repayment period is for a period of five (5) years;
   (k) **request voucher** means a preprinted form prepared by the Credit Union, or any other means authorized by the Credit Union, to be used by you to access loan advances on your account; and
   (l) **you or your** means each person who signs this Agreement as account holder.
2. **AGREEMENT TO REPAY/MINIMUM ADVANCE.** For value received and to be received, you agree to pay the Credit Union, according to the terms and conditions of this Agreement, all monies advanced for your account, together with any applicable charges thereon. The minimum amount per advance for your account is $500.00 excepting that: (i) any loan advance made pursuant to any overdraft protection agreement you may have with the Credit Union will be in multiples of $100.00 and (ii) any loan advance made to pay a credit life and/or disability insurance premium will be in an amount equal to such credit life and/or disability insurance premium. You may access your account by the use of a request voucher.
3. **PROHIBITION OF ADDITIONAL CREDIT ADVANCES.** The Credit Union may, in its discretion, prohibit additional extensions of credit (within your credit limit) or reduce your credit limit during any period in which: (a) the value of the real property described in the Deed to Secure Debt referenced in Paragraph 11 hereof declines significantly below such real property's appraised value (or value assigned to such real property by the Credit Union if an appraisal was not obtained) as of the date this account was effective; or (b) the Credit Union reasonably believes that you will be unable to fulfill the repayment obligations under this Agreement because of a material change in your financial circumstances; or (c) you are in default of any material obligation under this Agreement; or (d) the Credit Union is precluded by government action from imposing the annual percentage rate provided for in the Agreement; or (e) the priority of the Credit Union's security interest is adversely affected by government action to the extent that the value of the security interest is less than 120 percent of credit limit; or (f) the Credit Union has been notified by a government authority that continued advances may jeopardize the solvency of the Credit Union and constitute an unsafe and unsound business practice; or (g) the maximum percentage rate is reached.
4. **ADDITIONAL OBLIGATIONS.** You agree to pay at maturity any present or future indebtedness owing to the Credit Union and not to otherwise become in default under any writing relating to any present or future indebtedness owing to the Credit Union; you agree not to take any action (or fail to take any action should the case so require) that adversely affects the Credit Union's security for your

FECU-5257                                                                                                                    REV. 2/90

account or any right of the Credit Union in such security; you represent that you have not and will not commit any act of fraud in connection with this Agreement or your account (including any application made in applying for the account); you represent that you have not and will not make any material misrepresentation to the Credit Union in connection with this Agreement or your account (including any application made in applying for the account); you agree to maintain your financial affairs in such a manner as not to become insolvent and you agree not to make any assignment of your assets for the benefit of creditors; you agree to cause any action filed in any court of competent jurisdiction alleging that you are insolvent or unable to pay your debts as they mature, to be dismissed within forty-five (45) days from the date same is filed; you agree to abide by all of the terms and conditions of this Agreement and the Deed to Secure Debt; you represent that you are mentally competent and that you understand that your remaining competent is a material consideration in the Credit Union allowing you to maintain your account.

5. **ACCELERATION.** If you fail to pay when due any amount payable hereunder; or if any action or inaction by you adversely affects the Credit Unions security for your account or any right of the Credit Union in such security; or, if, in connection with this Agreement or your account (including any application made in applying for the account), you commit fraud or make a material misrepresentation to the Credit Union; then, your total indebtedness hereunder, at the option of the Credit Union, may be declared by the Credit Union to be immediately due and payable, and thereupon shall become immediately due and payable. Within ten days of making said declaration, the Credit Union shall give written notice to you that the total indebtedness has been declared immediately due and payable. The date of the declaration shall be deemed to be the date that the written notice of same is prepared, unless otherwise stated by the Credit Union in writing.

6. **WAIVER.** The Credit Union may exercise from time to time any and all rights and remedies available to it under this Agreement and any applicable law. The Credit Union shall not be deemed to have waived any of its rights hereunder unless such waiver be in writing and signed by the Credit Union, and no delay or omission by the Credit Union in exercising nay of its rights shall operate as a waiver of such rights, and a waiver in writing on one occasion shall not be construed as a consent to or a waiver of any right or remedy on any future occasion.

7. **CREDIT LIMIT.** The credit limit for your account is shown in Section A.  You  agree not to make or allow any loan advances to be made on your account which would result in the principal balance of your account exceeding your credit limit. If the principal balance of your account at any time exceeds your credit limit, the Credit Union can still collect from you for all loan advances made in excess of your credit limit, together with any applicable charges thereon, without waving any rights under this Agreement.

8. **FINANCE CHARGE.** The Credit Union figures the daily finance charge on your account by applying the daily periodic rate to the daily balance of your account.

   (a) To get the "daily balance" the Credit Union takes the beginning balance of your account each day, adds any loan advances posted that day, and subtracts: (i) any principal payments or credits posted that day; (ii) any unpaid late charges; and (iii) any unpaid finance charges.  This gives the Credit Union the daily balance.  Although the daily finance charges accrue each day, the daily finance charges are not posted to the account until a payment is received.  To determine the amount of the finance charge to be posted to the account upon the receipt of a payment, the Credit Union adds up the daily fiance charges for each day from the date on which your last payment was posted to the account (or when no payment has been made on the account, then from the date of the initial loan advance) through the date the current payment is posted to the account.

   (b) The daily periodic rate is computed by dividing the periodic rate by 365.  The periodic rate may change on each Change Date, up or down, depending on whether the prime rate (as hereinafter described) increases or decreases.  The periodic rate is indexed and equal to the "Prime Rate" published in the Money rates section of the Wall Street Journal, Eastern Edition ("Journal") on each Change Date.

   (c) The first day of each calendar quarter is a "Change Date."

   (d) If the Prime Rate in the Journal on a Change Date is stated as a range between two figures, then the Prime Rate in such an event shall be deemed to be the average of such two figures, rounded to the nearest one eighth of one percent.

   (e) The periodic rate will increase if the Prime Rate on any Change Date is higher than the Prime Rate in effect for the immediately preceding Change Date.

   (f) All changes in the periodic rate will be effective on the first day of the month following each calendar quarter.

   (g) If the periodic rate increases: (1) the total amount of the finance charges increases proportionally, causing the Annual Percentage Rate to likewise increase, and consequently the account balance after such an increase would be larger by the amount of the additional finance charges; and (2) the fact that additional finance charges; and (2) the fact that additional finance charges will be incurred may, (see Section F, Subsection 10) increase the amount of your minimum monthly payment.

   (h) The initial daily periodic rate is shown in Section B.  The corresponding **ANNUAL PERCENTAGE RATE** is shown in Section C.  Both the daily periodic rate and Annual Percentage Rate will change if the periodic rate changes pursuant to Paragraph 8(b) above.  Notwithstanding anything herein to be contrary, the periodic rate shall not be less than 6%. The maximum **ANNUAL PERCENTAGE RATE** for your account shall not exceed 21% or the maximum rate allowed by law, whichever is less.

   (i) The daily finance charges begin to accrue against your account on the date a loan advance is made.

9. **OTHER COSTS.** You will be charged, at the time the Credit Union enters into this Agreement with you, for: (a) an appraisal on the real property securing your account; (b) legal fees incurred by the Credit Union for a title examination on said real property; (c) filing fees incurred to record the security interest; and (d) a credit report.  The cost of each of the items listed in this paragraph is shown in Section D of this Agreement. If the minimum payment, as stated in Paragraph 10 hereof, is not received within ten (10) days from the due date, a late charge of five percent (5%) of the payment due will be assessed against your account.

10. **MINIMUM PAYMENT.**

   (a) During the Draw Period

     (1)  You agree to pay a minimum payment each month as calculated below.  Your minimum payment each month shall be the greater of: (1) $15.00 or (ii) (A) if the monthly periodic rate for billing cycle in question is in the range beginning with 10.0% and continuing through 16%, then 1.5% of your payment balance which does not exceed your credit limit; (B) if the monthly periodic rate for the billing cycle in question is in the range beginning with 16.1% and continuing through 21%, then 2.0% of that portion of the payment balance which does not exceed your credit limit; plus the entire portion fo the payment balance in excess of your credit limit; plus any amount past due.  The due date of your monthly minimum payment will be shown on your Funds Advance Voucher (upon each loan advance) or on any notification form from the Credit Union advising you of a change in the amount of your minimum payment.

     (2)  Notwithstanding anything herein to the contrary, if your minimum payment percentage changes during any first month of a calendar quarter and you do no make a loan advance during said month, your minimum payment shall, for such month, be calculated at the minimum payment percentage that was in effect for the immediately preceding month.

   (b) During the Repayment Period

     You agree to pay a minimum payment each month as calculated below.  Your minimum payment each month shall be the greater of: (i) $15.00 or (ii) 1/60th of your outstanding principal balance plus accrued finance charges plus the entire portion fo the outstanding

balance in excess of your credit limit plus any amount past due. The Credit Union will periodically notify you of the amount and due date of your monthly minimum payment.

**11. SECURITY.**
(a) To secure the Credit Union as to your performance of all covenants, promises and agreements you make under this Agreement (as same may be renewed, extended or modified);

(i) you hereby grant a security interest in and/or pledge your shares and/or deposits in the Credit Union; and

(ii) you agree to contemporaneously execute (or to cause the record title holders of the real property described in Section E to contemporaneously execute) a Deed to Secure Debt of even date herewith wherein the real property described in Section E will be pledged to secure the repayment of your account. The real property referenced in Section E is more particularly described in the Deed to Secure Debt. The Deed To Secure Debt is expressly incorporated herein by reference.

(b) Collateral securing other loans with the Credit Union may also secure this loan.

(c) Notwithstanding anything herein to the contrary and regardless of any other agreement the Credit Union may have with you, your shares and/or deposits in an Individual Retirement Account or Keogh Plan Account are not subject to any right of setoff or to your pledge of shares and deposits.

**12. APPLICATION OF PAYMENT.** The Credit Union reserves the right to apply payments and credits to your account in any manner permitted by law.

**13. PREPAYMENT.** You may prepay any amount, at any time and from time, without penalty or premium.

**14. FORM OF PAYMENT.** All payments on your account shall be made in United States currency or with a money order payable in United States dollars, or with a draft or a check drawn on a United States financial institution and payable in United States dollars. All payments shall be made payable to The Federal Employees Credit Union. If any payment on your account is not in the aforementioned form, the payment shall be deemed accepted by the Credit Union nor will it be credited to your account until the payment is converted into one of the acceptable forms as herein described (notwithstanding the inadvertent receipt of same by the Credit Union or its agents). The Credit Union or its agents may accept late payments, partial payments or any drafts, checks or money orders marked as being payment in full or as being a settlement of any dispute without losing any of its rights under this Agreement or under any law, and provided further, the act of acceptance of any such payments shall not be deemed to modify or change the terms or conditions of this Agreement.

**15. CREDIT RE-EVALUATION.** The Credit Union has the right, at any time and from time to time, during the period you have an account, to perform a review for the purpose of reassessing and/or investigating your credit-worthiness. To assist in such reassessment and/or investigation, you agree, upon request, to provide the Credit Union from time to time and at any time, with information regarding your current financial status. You hereby give your permission for the Credit Union to contact, without any notice to you, such necessary persons and/or organizations to accomplish such reassessment and/or investigation.

**16. NOTICES.** The notice required by this paragraph to be given to you and any other notices required by this Agreement to be given to you shall be deemed properly given and received by you when the Credit Union deposits said notice(s) in the United States Mail, postage prepaid, and addressed to you at the address last used by the Credit Union to communicate with you regarding your account (such as your periodic statement), which was not returned to the Credit Union by the United States Postal Department as being undeliverable.

**17. MODIFICATIONS.**
(a) The Credit Union has the right to unilaterally modify and/or change this Agreement to effect:

(i) a change in the index and margin used in Paragraph 8 hereof if the index stated in Paragraph 8 hereof is no longer available and the new index has an historical movement substantially similar to that of the index stated in Paragraph 8 and the new index and margin would have resulted in an annual percentage rate substantially similar to the rate in effect at the time the original index became unavailable;

(ii) a change that will unequivocally benefit you throughout the remaining term of this Agreement; and

(iii) Notice of any modification made to this Agreement, pursuant to Paragraph 17, shall be given in compliance with applicable law and/or regulation. You shall be bound by such modification and/or change as of the effective date thereof.

**18. AUTHORIZATION FOR LOAN ADVANCE.** In the event you become in default with any provision contained in Paragraph 3 or 4 hereof, then the Credit Union has the right to refuse authorization for any requested loan advance.

**19. PROPERTY INSURANCE.** Any property insurance that this Agreement requires you to purchase, may be purchased by you from anyone of your choice; however, the Credit Union reserves the right to refuse to accept, for reasonable cause, any insurer offered by you.

**20. JOINT RESPONSIBILITY.** If more than one person shall sign this Agreement as account holder, then the account established hereunder will be in the joint names of said persons. All of said persons who sign this Agreement as account holder are jointly and severally liable to the Credit Union for the account (each of said persons shall be the agent for the other and shall be responsible for the loan advances made by the other and for any modifications and/or changes made hereto by the other, whether with knowledge of same or not).

**21. TERM AND TERMINATION.**
(a) The initial draw period of this Agreement shall be for a period of five (5) years.

(b) Unless, during the initial draw period, the Credit Union gives you advance notice that the draw period will not be extended, the draw period will be extended automatically, without the requirement of any action on your part, for subsequent periods of one year each ("subsequent one year draw period"). Unless, during any subsequent one year draw period, the Credit Union gives you advance notice that the draw period will not be further extended, then the draw period will automatically be extended, without the requirement of any action on your part, for a subsequent period of one year.

(c) The repayment period begins immediately after the expiration of the draw period and continues for a period of five (5) years until your account is completely paid, whichever occurs first. During the repayment period you may not obtain any further loan advances and you must repay the outstanding balance of your account, as same existed at the end of the draw period, in sixty (60) monthly payments as provided herein.

(d) This Agreement may be terminated: (i) by the Credit Union pursuant to the terms and conditions of Paragraph 4 hereof; and (ii) by you at any time by your giving written notice to the Credit Union of you intent to terminate this Agreement.

(e) In the event that this Agreement is terminated pursuant to Paragraph 21 (d), other than the outstanding balance being due in full, all other terms and conditions of this Agreement shall remain enforce and effect until all sums due the Credit Union have been paid.

**22. INADVERTENT ERRORS.** The Credit Union will place safeguards into effect to minimize the likelihood of any errors occurring in the processing and servicing of your account; however, in the unlikely event that the Credit Union incorrectly and inadvertently identifies you and/or your account, by name and/or account number or otherwise, on any written publication or by publishing same

FECU-5357                                                                                          REV. 3/00

orally, as being delinquent in arrears, in default, or that the account is revoked, cancelled or terminated, you hereby waive any right of action you may have against the Credit Union regarding same.

**23. TIME OF ESSENCE/COLLECTION.** Time is of the essence of this Agreement and in case the indebtedness incurred hereunder is collected through an attorney at law, or under advice therefrom, you agree to pay all costs of collection, including fifteen percent (15%) of the outstanding principal and interest of the account as attorney's fees.

**24. CREDIT INSURANCE.** If you request credit insurance, the premium will be calculated monthly by multiplying the premium rate by the outstanding balance of the account. The premium rates per $1,000.00 of the monthly outstanding balance are disclosed to you in the credit insurance disclosure and application, which is a part of your Home Equity Access Application. Premiums will be posted at or after the end of each month. The premiums for your credit life and/or disability insurance are not financed, as they are based on the outstanding balance of the account and are paid periodically. Although such insurance is freely cancelable, it will be retained in effect until you have notified the Credit Union of your intention to cancel. If you are late in paying or fail to pay your periodic payment, the Credit Union may advance funds on your behalf to pay such premiums and the Credit Union amy impose additional finance charges on the amount financed.

**25. MISCELLANEOUS.**

(a)   The invalidity of any term or condition of this Agreement shall not affect the validity of any other term or condition. Except to the extent that federal law is applicable, this Agreement shall be governed and interpreted by Georgia Law. The headings of each numbered paragraph of this Agreement are for convenience only and shall not be considered in construing or interpreting the terms and conditions of this Agreement.

(b)   No modification and/or change or addition or   release of any guarantor, endorser, or surety shall affect the liability of any guarantor, endorser, surety or other party hereto.

**26. CARD REQUEST.** In the event, nor in the future, a credit card is allowable as an access device in utilizing the credit privilege granted in this Agreement, I/we request that such a card be issued.

**27. SHARE DRAFT ACCOUNT OVERDRAFT.** In the event your share draft account(s) at the Credit Union becomes overdrawn for any reason, the Credit Union may (but without any duty to do so and without any notice to you) effect a loan advance and transfer said funds to your share draft account(s) in a multiple of the unit amount designated by the Credit Union sufficient to cover the share draft account(s) deficiency.

**28. ADDITIONAL DISCLOSURES.**

**Possible Actions:** We can terminate your account, require you to pay us the entire outstanding balance in one payment, and charge you certain fees if:

-- You engage in fraud or material misrepresentation in connection with the plan.

-- You do not meet the repayment terms of the plan.

-- Your action or inaction adversely affects the collateral for the plan or our rights in the collateral.

We can refuse to make additional extensions of credit or reduce your credit limit if:

-- The value of the dwelling securing the plan declines significantly below its appraised value for purposes of the plan.

-- We reasonably believe that you will not be able to meet the repayment requirements, due to a material change in your financial circumstances.

-- You are in default of a material obligation of the plan.

-- Government action prevents us from imposing the annual percentage rate provided for under the plan or impairs our security interest such that the value of the interest is less than 120 percent of the credit line.

-- A government authority has notified us that continued advances would constitute an unsafe business practice.

-- The maximum annual percentage rate is reached.

The initial agreement permits us to make changes to the terms of the plan at specified times or upon the occurrence of specified events.

**Minimum Payment Requirements:** You can obtain advances of credit for a period of five (5) years from the date your account is opened (the "initial draw period").

During the initial draw period, payments will be due monthly. Your minimum monthly payment will equal the greater of $15.00 or the amount calculated by applying the appropriate minimum payment factor shown below to your payment balance*:

| If the periodic rate is: | the factor will be: |
|---|---|
| 10.0% through 16.0% | 1.5% |
| 16.1% through 21.0% | 2.0% |

\*  Your payment balance is the principal balance of your account immediately after either: (i) a loan advance; or (ii) a change in the minimum payment factor, whichever last occurs. (See Paragraph 1 above for a more complete definition of payment balance.)

We may agree to extend the initial draw period for additional consecutive terms for periods of one (1) year each; however, any decision by us to so extend any draw period shall be within our sole discretion. In the event of any extension, the minimum payments during any such extension will be the same as in the initial draw period.

After a draw period ends, you will no longer be able to obtain credit advances and must pay the outstanding balance over five years (the "repayment period"). During the repayment period, payments will be due monthly. Your minimum monthly payment will equal 1/60th of the balance that was outstanding at the end of the draw period plus the finance charges that have accrued on the remaining balance.

**Minimum Draw Requirement:** The minimum credit advance that you can receive is $500.00.

**Tax Deductibility:** You should consult a tax advisor regarding the deductibility of interest and charges under the plan.

The annual percentage rate includes only interest and not other costs.

FECU-8357                                                                                                   REV. 2/00

**YOUR BILLING RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**

This Notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors or Questions About your Bill**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at 6789 Peachtree Industrial Blvd., Atlanta, Georgia 30360. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appears. You can telephone us, but doing so will not preserve your rights.
In your letter, give us the following information:
· Your name and account number.
· The dollar amount of the suspected error.
· Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the items you are not sure about.
If you have authorized us to pay your credit card bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**
We must acknowledge your letter within 30 days, unless we have corrected the error
by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we did not make a mistake, you may have to pay finance charges, and we will have to make up any missed payments upon the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if your bill was correct.

ACCOUNT HOLDER ACKNOWLEDGES THE RECEIPT ON THIS DATE OF A COMPLETELY FILLED-IN COPY OF THIS INSTRUMENT PRIOR TO THE EXECUTION THEREOF. WITNESS MY/OUR HAND(S) AND SEAL(S) AND DELIVERY HEREOF, THE DAY AND YEAR BELOW WRITTEN.

Dated: February 7, 2002

Ronald L. Johnson

FECU-5357                                                                    REV. 2/00